John T. MEASDAY, Plaintiff-Appellee,

v.

KWIK–KOPY CORPORATION, Defendant-Appellant.

No. 82–2219.

United States Court of Appeals, Fifth Circuit.

Aug. 29, 1983.

120

Donald H. Fidler, Houston, Tex., for defendant-appellant.

Charles W. Owens, Lakewood, Colo., Joseph S. Cohen, Houston, Tex., for plaintiff-appellee.

Before RUBIN, GARZA and WILLIAMS, Circuit Judges.

GARZA, Circuit Judge:

Defendant-appellant, Kwik-Kopy Corporation, is a national franchisor of instant printing centers. In March 1976, Kwik-Kopy and Measday Enterprises, Inc., had an existing franchisor/franchisee relationship. At that time Measday Enterprises, Inc., was equally owned by Mr. and Mrs. John Measday and Mr. and Mrs. McKenzie. From the beginning John Measday had assumed management responsibility for the franchise, and in 1978 he desired to buy out the McKenzies.

In early 1978, in an effort to obtain additional income, plaintiff-appellee, John Measday, began discussions with Kwik-Kopy regarding the possibility of additional employment with Kwik-Kopy. On June 28, 1978, Measday traveled to Kwik-Kopy's headquarters in Houston. While in Houston he entered into a loan guarantee agreement with Kwik-Kopy which allowed him to buy out the McKenzies. Measday and Kwik-Kopy also executed a Regional Franchise Director Agreement (hereinafter RFD Agreement) and Addendum thereto—the subject of the suit below and this appeal.

In pertinent part, the contract generally provided:

(1) Measday would serve as Kwik-Kopy's Regional Franchise Director.

(2) Measday was responsible for selecting proposed Kwik-Kopy locations in his region in negotiating leases, subject to Kwik-Kopy's approval.

(3) Measday's "prime responsibility" under the terms of the contract was "the development of prospects for sale of Kwik-Kopy franchises."

(4) Once an applicant for a Kwik-Kopy franchise has been found to be qualified, Measday was to provide Kwik-Kopy with a completed franchise application along with the applicant's $1,000.00 deposit and was to assist Kwik-Kopy in completing the sale.

(5) Kwik-Kopy was to pay Measday varying commissions, depending on Measday's involvement in the sale, for each sale of a Kwik-Kopy franchise within his region.

(6) In consideration of the rights he received under the contract, Measday agreed to pay Kwik-Kopy $10,000 to be paid out of the commissions to which he was entitled.

(7) Generally, Measday was to pay his own business expenses and operate as an independent contractor.

(8) Measday was "to devote his full time, energy and effort, making the fullest use of his experience and training, to promote and develop the Kwik-Kopy Trademark and Trade Name in the ... regional area, in addition to promoting the sale of Kwik-Kopy franchises in the given area."

(9) Measday was to meet certain quotas. During the first year, he was to deliver to Kwik-Kopy "six applications for the purchase of franchises in said regional area, together with the prescribed deposit payments of $1,000 from each of said applicants." During the second, third, fourth and fifth years, Measday was to deliver "ten applications for the purchase of franchises each year."

(10) "At the end of the fifth year and thirty days prior thereto, a new quota schedule and a new commission schedule, shall be in order, and shall be negotiated by the parties hereto, depending upon the economic conditions, growth factors and other unforeseeable circumstances."

(11) Kwik-Kopy could cancel the agreement, upon proper notice, if Measday failed to meet his quotas.

(12) Kwik-Kopy was to provide a $10,000 advertising budget for Measday to use to promote the purchases of franchises in his region.

(13) For the duration of the contract and for two years thereafter, Measday was not to compete with Kwik-Kopy and was not to divulge any of Kwik-Kopy's trade secrets.

During Measday's tenure as a Regional Franchise Director, he rented an office from which he operated as the Regional Franchise Director; he established certain procedures for contacting potential franchises; he made site selections for potential franchises; he submitted reports to Kwik-Kopy; he communicated frequently with Kwik-Kopy; and within the first year of the contract he submitted eleven applications for Kwik-Kopy franchises.[1]

---

1. Ten of these applicants eventually purchased Kwik-Kopy franchises.

In February 1979, Mr. and Mrs. Measday and Mike Glass, an employee of Measday's Kwik-Kopy shop, incorporated a business known as Mi-Di-Jo, Inc. Mi-Di-Jo, Inc., was operated as a typesetting business. It had two locations: one contiguous to Measday's Kwik-Kopy Printing Center and the other at Measday's Regional Director office.

In October 1979, Tom Malone, Kwik-Kopy's Director of Marketing, visited Measday in Denver. Malone talked to Measday about a new Area Representative Agreement Kwik-Kopy wanted him to sign. Shortly before he left, Malone gave Measday a copy of the instrument. After briefly looking over the agreement, Measday informed Malone that he did not think he could work under the agreement and that he preferred to work under the existing contract.[2] Malone told Measday that he really did not have much choice.

A few weeks later Malone called Measday and inquired as to whether Measday would sign the new agreement. Measday told Malone that he could not sign the new agreement but preferred to work under the existing agreement. Malone told Measday that he did not have that choice and that if he wanted to continue working with Kwik-Kopy he would have to sign the new agreement.

On November 1, 1979, Malone sent Measday a letter terminating the existing RFD Agreement effective November 30, 1979.[3] Mr. Malone's letter attempts to enshroud Kwik-Kopy's reasons for unilaterally terminating the RFD Agreement. The gist of the letter, however, is that Kwik-Kopy terminated the contract because the contract was not economically beneficial to Kwik-Kopy.

On November 15, 1979, Measday's attorney wrote Kwik-Kopy and demanded that Kwik-Kopy either abide by the terms of the RFD Agreement or compensate Measday for breaking the contract. Kwik-Kopy did terminate the contract, and this suit for damages and specific performance was brought on January 18, 1980.

2. Measday's two major objections to the contract were that it was only an annual agreement and that he would have had to sell his Kwik-Kopy franchise.

3. The letter stated:

The purpose of this letter is to confirm our personal conversation of October 17 and 18, wherein we discussed the new Area Representative Agreement.

The projected growth of Kwik-Kopy, along with the resulting increase in support requirements for our franchising effort have made it necessary that we carefully evaluate the resources which we have to sell and maintain future Kwik-Kopy franchises.

In evaluating our future efforts, we concluded that if we were to be able to continue our sales efforts by independent contractors on a justifiable, economic basis, it would be necessary to have them carry their share of the tasks in connection with the overall sales process.

We like our present arrangement of sales thru independent contractors and we think it is a good one. We would like to keep it, but we can continue with it only if we are able to make a functionally interfitting relationship which is economically sound and effective from both of our viewpoints.

In this regard, we have spent a great deal of time and deliberation formulating exactly what we believe is necessary to meet our corporate sales and cost needs for our marketing efforts, and at the same time, provide our independent contractors with the continued opportunity to earn top commissions. In any contractual relationship, there is a considerable amount of give and take, and we would like to feel that our future relationship will be reasonably balanced between the economic awards to you, and our corporate needs with respect to performance and costs. The new Area Representative Agreement, we believe, represents a good future balance for both of us, and does, in fact, enhance your earnings potential.

After extensive consideration and deliberation, we have reached the decision that the present contractual relationship is inadequate and that we can continue with independent contractors only if we obtain a more comprehensive basis for their representation. Therefore, all Regional Franchise Director Agreements are terminated as of November 30, 1979.

We sincerely hope you will understand our position and that you will find the new Area Representative Agreement as a satisfactory basis to continue on with representation for Kwik-Kopy Corporation.

If I may be of help in any way, or if you have any questions not answered in our recent meeting, please do not hesitate to call.

Motions for summary judgment were subsequently filed by both the plaintiff and defendant. In response to the motion for summary judgment, on January 6, 1982, the district court issued an order that the contract was valid between the parties for a term of five years from June 28, 1978 to June 28, 1983. On February 16, 1982, a jury trial began and on February 18, 1982, the jury returned a verdict that plaintiff had substantially performed under the contract and that the plaintiff's damages were $176,408. On April 29, 1982, the trial court awarded the plaintiff approximately $25,000 in attorney's fees. A final judgment for a total of $201,378.50 was entered on April 29, 1982.

Appellant, Kwik-Kopy, raises several issues on appeal. Kwik-Kopy first contends that the trial court erred in granting partial summary judgment for Measday. Appellant argues the contract was terminable at will and was not enforceable for a five-year term. We disagree.

█ In Texas, whether an instrument is ambiguous is a question of law. *Lasater v. Convest Energy Corporation,* 615 S.W.2d 340, 343 (Tex.Civ.App.—Eastland 1981, writ ref'd n.r.e.). If the court finds no ambiguity, the construction of the contract is a question of law for the court. *City of Pinehurst v. Spooner Addition Water Company,* 432 S.W.2d 515, 518 (Tex.1968). In such a case arbitrary rules of construction should not be resorted to; the court must enforce the unambiguous content of the contract. *See Monsanto Company v. Tyrrell,* 537 S.W.2d 135, 137 (Tex.Civ.App.—Houston [14th Dist.] 1976, writ ref'd n.r.e.); 14 Tex. Jur. 3D *Contracts* § 184. Here the district court was correct in finding the contract was not ambiguous and in its construction of the terms of the contract.

The RFD Agreement does not specifically innumerate the term of the contractual relationship. In viewing the contract within its "four corners," reading all clauses together and giving effect to each,[4] however, it is unmistakably clear that the parties intended for the contract to be effective for five years. The RFD Agreement sets forth application quotas for Measday to meet for five years; it allows Kwik-Kopy to cancel the agreement, upon proper notice, if Measday fails to comply with the quota schedule; and it provides for negotiation of a new quota schedule at the end of five years. The district court, therefore, was correct when it stated: "Viewing the contract as a whole, the parties expressed their intent to enter into a five-year relationship which could be terminated by the Defendant under certain conditions."

Kwik-Kopy next asserts the jury instruction was in error. The specific complaints concern the district court's instruction on substantial performance and the district court's failure to submit an issue on Measday's alleged breach.

█ The problem of substantial performance normally is presented where one party has failed to render a part of the performance as or when promised and the question arises as to whether the other party is privileged to refuse to render a reciprocally promised performance. *Corbin on Contracts* § 700. It typically arises in construction contracts where a builder claims from the owner payment of the unpaid balance due under the contract; if the builder has not substantially performed, the builder has no claim for the unpaid balance. *See* Restatement (Second) of Contracts § 237 comment (d) (1979). The principle of substantial performance may be expressed by saying:

> . . . that a breach which is material, or which goes to the root of the matter or essence of the contract, is fatal to the plaintiff's case in spite of his part performance; or . . . saying that a plaintiff who has substantially performed is entitled to recover, although he has failed in some particular to comply with his agreement.

*Williston on Contracts,* 3d Ed. § 842. *See Warren v. Denison,* 563 S.W.2d 299, 303 (Tex.Civ.App.—Amarillo 1978, no writ). In other words, if a party has committed a

---

4. *See City of Midland v. Waller,* 430 S.W.2d 473, 478 (Tex.1968).

material breach [5] his performance cannot be substantial. J. Calamari and J. Perillo, *The Law of Contracts* § 11–14 (1977).

■ Application of the doctrine of substantial performance is not limited to construction contracts. *Corbin on Contracts,* § 701. It is also pertinent to service or employment contracts. *Id.* at § 675. An employee, therefore, must substantially perform his promised service before promised wages can be recovered from his employer. *Id.* Texas law applies substantial performance to employment and service contracts in a much broader sense. In Texas the issue of whether an employee substantially performed can arise where an employee performs, the employer pays the agreed sum and then the employer discharges the employee. *See Texas Reserve Life Insurance Company v. Allen,* 415 S.W.2d 484, 486 (Tex.Civ.App.—Tyler 1967, no writ); *Dixie Glass Co. v. Pollak,* 341 S.W.2d 530, 542 (Tex.Civ.App.—Houston 1960), writ ref'd n.r.e., 162 Tex. 440, 347 S.W.2d 596 (1961); *Dallas Hotel Co. v. Lackey,* 203 S.W.2d 557, 562 (Tex.Civ.App.—Dallas 1947, writ ref'd n.r.e.). In such cases a finding of substantial performance is equivalent to a finding of wrongful discharge. *Hadra v. Herman Blum Consulting Engineers,* 632 F.2d 1242, 1245 (5th Cir.1980), *cert. denied,* 451 U.S. 912, 101 S.Ct. 1983, 68 L.Ed.2d 301 (1981); *Dixie Glass Co. v. Pollak, supra,* at 542. A jury instruction and interrogatory on substantial performance, therefore, serves the same purpose as a similar submission on wrongful discharge. *Compare Mr. Eddie Inc. v. Ginsberg,* 430 S.W.2d 5, 11 (Tex.Civ.App.—Eastland 1968, writ ref'd n.r.e.), *with Dallas Hotel Co. v. Lackey, supra,* at 562.

■ The jury instruction on substantial performance was as follows:

The question for your consideration is whether Mr. Measday has established that he had substantially performed under the contract at the time Kwik Kopy terminated it. Mr. Measday can establish substantial performance by showing: that before the date on which Kwik Kopy terminated the contract, Mr. Measday had substantially complied with his obligations under the contract; or that Kwik Kopy had accepted Mr. Measday's performance under the contract; or that Kwik Kopy had waived any failure of Mr. Measday to comply with the terms of the contract. You are instructed that "waiver" is the intentional relinquishment of a known right after knowledge of the facts.

If you conclude that Mr. Measday has established any one of these elements by a preponderance of the evidence, then you should find that Mr. Measday had substantially performed under the contract. If on the other hand you conclude that Mr. Measday has failed to establish any one of these elements, then you should find that Mr. Measday had not substantially performed under the contract.

There are several problems with this instruction.

The instruction allowed the jury to find substantial performance in three different instances. First, the jury could find substantial performance if it decided "Mr. Measday had substantially complied with his obligation under the contract." Substantial performance can be defined "as performance of the essential elements of a contract, provided that the defects in performance do not prevent the parties from accomplishing the purpose of the contract." *Matador Drilling Company v. Post,* 662 F.2d 1190, 1195 (5th Cir.1981). The district court's instruction allowed the jury to find Measday had substantially performed without finding that the entire purpose of the RFD Agreement had been accomplished. This portion of the instruction was, therefore, in error. *See O.W. Grun Roofing & Const. Co. v. Cope,* 529 S.W.2d 258, 261 (Tex.Civ.App.—San Antonio 1975, no writ).

Second, the jury could find substantial performance if it determined "Kwik-Kopy had accepted Mr. Measday's performance under the contract." Although acceptance of performance can be an important element in determining if there was substan-

---

**5.** See generally Restatement (Second) of Contracts § 241 (1979).

tial performance, acceptance of performance alone does not constitute substantial performance. *See generally Williston on Contracts* 3d ed. § 843.

Substantial performance of a contract is shown when party alleging substantial performance has made an honest endeavor in good faith to perform his part of the contract, when results of his endeavor are beneficial to other party, and when such benefits are retained by the other party; if any one of these circumstances is not established the performance is not substantial, and the party has no right of recovery.

Black's Law Dictionary 1281 (rev. 5th ed. 1979). The district court's instruction allowed the jury to find Measday had substantially performed without concluding that Measday had made an honest effort to perform his obligations under the contract and without finding that Kwik-Kopy benefited from Measday's efforts. This portion of the instruction was, therefore, erroneous.

Third, the jury could find substantial performance if it concluded "that Kwik-Kopy had waived any failure of Mr. Measday's to comply with the terms of the contract." A finding of waiver does not constitute a finding of substantial performance. A finding of substantial performance establishes that there was no material breach by Measday. J. Calamari and J. Perillo, *The Law of Contracts* § 11–14 (1977). A finding of waiver, on the other hand, establishes that any breach by Measday is excused. *Id.* at § 11–33. As can be seen, the practical effect, in this case, of a finding of waiver and substantial performance is the same. Therefore, although this portion of the instruction was technically in error, Kwik-Kopy was not prejudiced.

One problem remains with the jury instruction. The jury was instructed to find Measday had substantially performed if it found "any one" of the elements had been established and to find Measday had *not* substantially performed if it concluded "any one" of the elements had *not* been established. Assuming the elements were correctly set forth, the part of the instruction

telling when to find substantial performance was correct. The portion directing the jury when to find Measday had not substantially performed was incorrect; the jury should have been instructed to find Measday had not substantially performed if it concluded that none of the three elements had been established. Under the district court's instruction the jury was required to find both that Measday had substantially performed and that he had not substantially performed if it found the evidence established one or two of the elements. The jury was, therefore, allowed to find Measday had not substantially performed in situations where substantial performance had been established. Again assuming the elements were correct, the jury could not have found substantial performance where it had not been established. Consequently, although this portion of the instruction was in error, the error was not prejudicial to Kwik-Kopy.

Even though the jury instruction on substantial performance was erroneous, reversal is not required. In Texas the party seeking recovery has the burden of establishing substantial performance. *See Matador Drilling Company v. Post, supra,* at 1195; *Goode v. Wood,* 509 S.W.2d 435, 441 (Tex.Civ.App.—Corpus Christi 1974, writ ref'd n.r.e.); *Uvalde Rock Asphalt Co. v. Fantham,* 210 S.W.2d 646, 650 (Tex.Civ. App.—Galveston 1948, no writ). Measday, consequently, had the burden of setting forth facts establishing substantial performance. Measday met this burden by presenting evidence showing he rented an office from which he operated as the Regional Franchise Director; he established certain procedures for contacting potential franchises; he made site selections for potential franchises; he submitted reports to Kwik-Kopy; he communicated frequently with Kwik-Kopy; and within the first year of the contract he submitted eleven applications for Kwik-Kopy franchises. Kwik-Kopy was then entitled to present evidence showing Measday had not substantially performed, thereby justifying Measday's termination. In Texas when an employer assigns grounds for discharge of an employee, it

cannot later justify the termination on grounds that were not made the basis of the termination at the time of the discharge.[6] *Levy v. Jarrett,* 198 S.W. 333, 335 (Tex.Civ.App.—Amarillo 1917, no writ). *See Phoenix Insurance Co. v. Ross Jewelers Inc.,* 362 F.2d 985, 987–988 (5th Cir.1966). The gist of the letter, terminating the RFD Agreement, was to the effect that Kwik-Kopy was unilaterally terminating the contract because the contract was not economically beneficial to Kwik-Kopy; the only other ground for termination stated in the letter was that Measday refused to accept Kwik-Kopy's proposed modifications.[7] Kwik-Kopy is precluded, as a matter of law, therefore, from asserting any other grounds for terminating the contract.

■ These reasons are legally insufficient to refute Measday's proof of substantial performance. It is elementary that one party to a contract cannot terminate a contract because the other party to the contract will not assent to modification of

the contract. 14 Tex.Jur. *Contracts* § 244. Likewise, a party to a contract is not excused from performance simply because it does not find the economic end of the contract to be ideal. *See* J. Calamari and J. Perillo *The Law of Contracts* § 13–9 (1977). As a matter of law therefore, Measday substantially performed the terms of the contract and was wrongfully discharged. Consequently, any error in the jury instruction on substantial performance was meaningless.

■ Likewise, the district court did not err in refusing to submit a defensive issue on Measday's alleged breach. Kwik-Kopy contends the issue was necessary to show its performance was excused. Since Kwik-Kopy's performance was not excused as a matter of law, the trial court properly denied Kwik-Kopy's request for a defensive issue on Measday's alleged breach.[8]

■ Kwik-Kopy next attacks the jury's award of damages.

---

**6.** The Texas rule is contrary to the general rule. *Williston on Contracts* § 839 states:

> An employer who discharges an employee in ignorance of a sufficient cause for discharge is not liable if, in fact, an adequate cause existed.

*Corbin on Contracts* § 762 states:

> The fact that the master omits to mention this cause, either because he does not know it or because he prefers to state some other reason, does not deprive him of his privilege to discharge and make his action a breach of contract. In cases like this the servant can seldom show an estoppel against the master, for the reason that he can seldom show that he has materially changed his position in reliance upon a reasonable belief that the master is willing to overlook the sufficient reason for discharge.

Restatement (Second) of Contracts § 248 Comment b (1979), provides:

> Just as the injured party is not, as a general rule, precluded from relying on a reason for rejection because he stated no reasons, he is not precluded by the mere fact that he stated an insufficient reason, even though he knew or had reason to know of a sufficient one.

Restatement (Second) of Contracts § 237 comment c, illustration 8 reads:

> 8. A and B make an employment contract. After the service has begun, A, the employee, commits a material breach of his duty to give efficient service that would justify B in discharging him. B is not aware of this but discharges A for an inadequate reason. A has no claim against B for discharging him. B has a claim against A for damages for total breach (§ 243) based on B's loss due to A's failure to give efficient service up to the time of discharge, but not for damages based on the loss of A's services after that time, because that loss was caused by B's discharge of A and not by A's failure to give efficient service.

Finally, J. Calamari and J. Perillo *The Law of Contracts,* § 11–38 states:

> In stating his reasons for rejecting performance of his objections to a performance which he has accepted a promisee runs the risk of excusing other grounds upon which he might have rejected a defective performance at least under some of the decided cases. But the better view is that this result should obtain only where there is in fact pattern basis for an estoppel.

**7.** See note 3.

**8.** In Texas, in a service contract, a finding of substantial performance is equivalent to a finding of wrongful discharge. *Hadra v. Herman Blum Consulting Engineers, supra,* at 1245. Therefore, even if Kwik-Kopy's performance was not excused as a matter of law, if the court had properly submitted the instruction on substantial performance an issue on Measday's alleged breach would not have been necessary.

The general rule as to the correct measure of damages for wrongful discharge of an employee is the present cash value of the contract to the employee "... if it had not been breached, less any amounts that he should in the exercise of reasonable diligence be able to earn through other employment." *Dixie Glass v. Pollak,* 341 S.W.2d 530, 538 (Tex.Civ.App.—Houston), *writ ref'd n.r.e. per curiam,* 162 Tex. 440, 347 S.W.2d 596 (1961). *Greater Fort Worth and Tarrant County Community Action Agency v. Mims,* 627 S.W.2d 149, 151 (Tex.1982). *See La Marque Independent School District v. Thompson,* 580 S.W.2d 670, 673 (Tex.Civ.App.—Houston [14th Dist.] 1979, no writ). The jury instruction fairly presented Texas law. In essence the jury was instructed that Measday's damages were the present value of his lost earnings, less any expenses he saved, less the amount he could have reasonably realized if he had taken advantage of any opportunity to mitigate his damages. Furthermore, the jury obviously followed this formula. The figure arrived at by the jury, $176,408.00, was the same figure arrived at by Measday's experts and the experts applied the proper standard.[9]

Kwik-Kopy questions the credibility of the experts' testimony. The jury, however, chose to believe the experts' testimony. This court is not empowered to challenge the credibility which the jury chose to give the experts' testimony. *Meineke Discount Muffler Shops Inc. v. Bleier,* Slip opinion No. 81–2496 (5th Cir. June 23, 1981).

Next, Kwik-Kopy contends Measday failed to properly mitigate damages. It is axiomatic that Measday had a duty to use reasonable diligence to mitigate his damages. *Schwartz v. NMS Industries Inc.,* 575 F.2d 553, 556 (5th Cir.1978); *Mr. Eddie Inc. v. Ginsberg, supra,* at 9. Kwik-Kopy, however, had the burden of showing Measday failed to fulfill this duty. *Fidelity and Deposit Company of Maryland v. Stool,* 607 S.W.2d 17, 25 (Tex.Civ.App.—Tyler 1980, no writ); *Mr. Eddie Inc. v. Ginsberg, supra,* at 9. Kwik-Kopy neglected to present any evidence to prove that Measday failed to exercise reasonable diligence to gain other employment.[10] Kwik-Kopy's contention, therefore, is without merit.

Finally, Kwik-Kopy asserts the district court erred in awarding Measday attorney's fees. Kwik-Kopy concedes that under Article 2226 Texas Revised Civil Statutes any person, having a valid claim against a corporation for services rendered or based on a written contract, may recover reasonable attorney fees in addition to the claim and cost. Kwik-Kopy points out, however, that Article 2226 requires the claimant to present the claim to the potential defendant and precludes the claimant from recovering attorneys fees if the claim is paid within thirty days. Kwik-Kopy argues that Measday failed to comply with the presentment requirement in the statute. Measday, on the other hand, asserts that a November 15, 1979 letter from Charles W. Owens, Measday's attorney, to Tom Malone was a proper presentment.

Article 2226 does not require that the presentment of the claim be in any par-

---

9. Measday's evidence on damages was presented by two experts. Mr. Gelb, a qualified market consultant, testified that Measday's lost commissions resulting from his wrongful discharge totaled $223,000. Gelb, also, testified extensively concerning his methods of calculation. As Kwik-Kopy points out, Mr. Gelb's methods do not produce an exact figure. However, it was only necessary for Mr. Gelb to offer data with a reasonable degree of exactness and certainty. *See Southwest Battery Corporation v. Owen,* 131 Tex. 423, 115 S.W.2d 1097, 1098 (Tex.1938).

The second expert, Mr. Dolan, a Certified Public Accountant, testified that Measday's net loss was $176,408. He arrived at this figure by assuming Measday's lost gross income was $223,000 and reducing this figure by expenses that Measday would have incurred in earning the commissions; the net was then reduced to present value.

10. Note that evidence was presented at trial showing Measday made efforts to find other employment. Measday testified he submitted a bid to do a marketing survey for a Canadian province; he made efforts to set himself up as manufacturer's representative for various lines; he sent resumes to several firms; and he ran ads offering his services in several newspapers.

ticular form or manner. All that is required is an assertion of the right to be paid and a request for payment. The purpose of the presentment is to make the debtor aware that a claim is being made, so he can pay the claim within 30 days and avoid liability for the creditor's attorney's fees.

*Hardin Associates, Inc. v. Brummett,* 613 S.W.2d 4, 7 (Tex.Civ.App.—Texarkana 1980, no writ). After reviewing the November 15, 1979 letter we conclude it contained an assertion of a right to be paid and a request for payment and was, therefore, a proper presentment. The district court, consequently, did not err in awarding attorney's fees.

Finding no reversible error the judgment of the district court is affirmed.

AFFIRMED.

ALVIN B. RUBIN, Circuit Judge, dissenting.

I respectfully dissent for two reasons. First, I cannot agree with my colleagues that we may now refract the erroneous jury instruction through the lenses of hindsight and conclude that Measday satisfied his burden of proof. That question was for the jury, after proper instruction.

Second, although my colleagues are both Texas lawyers and I am an apprentice at its law, I disagree with their conclusion that Texas law permits an employer to prove only the cause for discharge it advances on termination. In *Maxwell v. Cardinal Petroleum Corp.,* 471 S.W.2d 785 (Tex.Civ.App. 1971), the court held an employer who is dissatisfied with an employee's efforts to perform a contract may discharge the employee unless it acts in bad faith. The court found that the jury might conclude that the employer did not act in good faith and remanded the case, noting: "Upon remand . . . an issue inquiring about [the employer's] *good faith dissatisfaction* with [the employee's] performance of the contract will suffice." *Id.* at 789 (on motion for rehearing) (emphasis added). The court did not limit the special issue to whether the employee had agreed to get more business,

although his failure to do so was the reason the employer gave for the discharge. Similarly, in *Zuider Zee Oyster Bar, Inc. v. Martin,* 503 S.W.2d 292 (Tex.Civ.App.1973), the court held that the employer was not entitled to special issues on six reasons advanced for the employee's discharge because the employer was "without material evidence on a material issue concerning anything [the employee] had failed to do which constituted a breach of any duty owed under the contract." *Id.* at 295. The court did not suggest that the employer could not have advanced all of these contentions had it been able to produce evidence.

Other states permit an employer to advance any reason supported by the evidence to justify a discharge. *See* maj. op., 713 F.2d at 126 n. 6. A single decision rendered 66 years ago is inadequate support for a categorical ruling that Texas has an unusual doctrine to the contrary. The employer who might salve an employee's feelings when discharging him by giving some reason not damaging to the employee's pride is permitted to do so only at the expense of forfeiting better-based defenses to a law suit that courtesy precluded before the employee chose to litigate.

I would reverse the judgment.