Jerry **BUCHANAN**, Plaintiff,

v.

Jerry **DOWDY** a/k/a J.H. Dowdy and Viking Travel, Inc., Defendants.

No. H–89–3005.

United States District Court,
S.D. Texas,
Houston Division.

Aug. 22, 1991.

---

Douglas H. Reynolds, Cox & Reynolds, Fort Lauderdale, Fla., for plaintiff, Jerry Buchanan.

Douglas Sandvig, Kissner & Sandvig, Houston, Tex., for defendant, Jerry Dowdy, Viking Travel, Inc.

**970**

## OPINION

FRANCES H. STACY, United States Magistrate Judge.

This action came on for trial on February 19, 1991, through February 22, 1991. Plaintiff's claims were tried to a United States Magistrate Judge presiding by consent of the parties pursuant to 28 U.S.C. § 636(c).

The Court, having heard testimony, examined the evidence adduced by the representative parties, heard the arguments of their counsel and being fully advised herein, and this cause having been submitted for decision, makes the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

In 1983, Plaintiff (hereinafter referred to as "Buchanan" or "Plaintiff"), Antony Underwood (hereinafter referred to as "Underwood") and Mary Obolensky formed Obolensky & Associates, Inc., a Texas corporation (hereinafter referred to as the "Corporation" or "VIKING"). The Corporation from its beginning engaged in the business of conducting a travel agency in Houston, Harris County, Texas. Each of the three shareholders owned five hundred (500) shares of the outstanding fifteen hundred (1,500) shares of common stock. In the fall of 1985, Defendant, Jerry Dowdy, (hereinafter referred to as "Defendant" or "Dowdy") acquired the five hundred (500) shares of common stock in the Corporation previously owned by Mary Obolensky.

In March, 1988, Dowdy advised Buchanan and Underwood that he wanted his brother-in-law, Paul Baueries, placed in the business for the purpose of observing it and making recommendations as to how to increase the profitability of the Corporation. After March, 1988, Paul Baueries became involved in the day-to-day operations of the Corporation and made decisions as to its financial status. Shortly thereafter, negotiations began between Dowdy and the remaining shareholders, Buchanan and Underwood, for the purpose of his purchasing their stock in the Corporation. Underwood sold 498 of his five hundred

(500) shares to Dowdy on June 25, 1988. On July 8, 1988, Buchanan and Dowdy entered into two agreements simultaneously. The first agreement was a Stock Purchase Agreement whereby Dowdy purchased Buchanan's five hundred (500) shares of stock in the Corporation. The second agreement was a Non–Compete Agreement whereby Buchanan agreed to continue as a marketing consultant for the Corporation. The two agreements were executed simultaneously on July 8, 1988.

Pursuant to the Non–Compete Agreement, Buchanan was granted the right to act as the Corporation's outside sales representative in connection with the sale of its travel agency services. This Agreement became effective on the 8th day of July, 1988, and had a minimum term of one year, and continued thereafter from month to month until termination by either party in its or his discretion upon thirty days written notice. It is undisputed that thirty days written notice of termination was never provided by either party. The compensation, which was personally guaranteed by Dowdy, to be paid to Mr. Buchanan by the Corporation, was set forth in Paragraph 4 of the Non–Compete Agreement which provided as follows:

(a) a sum of $3,000 per month, payable $1,500 on the first day of each month and $1,500 on the fifteenth day of each month during the term of this agreement. In the event this agreement is terminated prior to Marketing Consultant receiving the sum of Thirty–Six Thousand Dollars ($36,000) as set out in this paragraph, the Company shall pay Marketing Consultant as termination pay the sum of Thirty–Six Thousand Dollars ($36,000) less the amount previously paid hereunder.

(b) in addition to the compensation set out above, Marketing Consultant shall receive a thirty-three and one-third percent (33⅓) of the gross commission paid to the Company as a result of new business brought to the Company by the Marketing Consultant. "New business" shall mean any business from a client or person or company not presently doing business with the Company procured by

Marketing Consultant. "Business" shall mean all air and cruise ticketing, plus all land, car, and hotel sales associated with a tour group F.I.T. or corporate traffic. The term "gross commission" as used in this agreement shall mean the total commission paid to the Company as a result of said new business procured by Marketing Consultant, or gross profits from tours (gross profits as described on Appendix A).

(c) Marketing Consultant shall bear all costs and expenses incurred by Marketing Consultant in connection with rendering of services hereunder, except if certain costs or expenses are pre-approved by Company. Company will provide necessary administrative support and clerical backup for Marketing Consultant to effectively generate projected future income (See Appendix A).

(d) All commissions earned shall be paid to Marketing Consultant not later than the 15th day of the month following the month during which commissions were earned.

After entering into the agreement on July 8, 1988, Buchanan proceeded to serve as a marketing consultant of the Corporation and sold various travel services, including the Grand Tour of Sweden and the Chicago Arts Museum Trip.

On August 22, 1988, Buchanan submitted his commission calculations for July 1988 to Paul Baueries. Paul Baueries disputed the amount in a memorandum on August 22, 1988, but proceeded to pay the amount claimed by Buchanan on August 26, 1988. This payment included commissions on sales to two clients, Hirsch and Atkins, who had done business with the agency before July 8, 1988.

Buchanan continued to perform under the agreement. In October, 1988, Defendants terminated Betty Weiner, a clerical employee at Viking, who assisted Buchanan. This undermined Plaintiff's ability to perform and promote tours. Soon after this, the relationship between Buchanan and the Defendants began to deteriorate.

On November 3, 1988, Buchanan wrote to Dowdy, and informed him that he was not being properly compensated and that he was not receiving clerical and administrative backup pursuant to the agreement. On November 15, 1988, Dowdy entered into a purchase and sale agreement whereby he transferred to his brother-in-law, Paul Baueries, all of the assets of Viking. Paul Baueries' new corporation was named Viking Travel Services, Inc. The transferred assets included customer lists, client profiles, and telephone numbers. The employees who had worked for Defendant Viking began to work for Viking Travel Services, Inc.

On November 22, 1988, Buchanan again wrote to Dowdy advising that Buchanan was not receiving the compensation due pursuant to Paragraph 4 of the Non–Compete Agreement. His letter made reference to the fact that the parties agreed, through that point in time, that Defendants owed Buchanan $29,114.52. One week later, Buchanan through his counsel, Barry Roberts, made a formal written demand upon the Defendants to pay the sums due and owing pursuant to Paragraph 4 of the Non–Compete Agreement. At trial Dowdy admitted that he never responded to the letters nor to Buchanan's handwritten calculations provided to him prior to the letters.

Between July 8, 1988 and November 15, 1988, Buchanan was paid $12,750 with respect to Paragraph 4(a) of the Non–Compete Agreement. Also during this time, Buchanan generated gross commissions of $11,069.94, calculated as follows:

| | |
|---|---|
| July Sales: | $ 677.47 |
| August Sales: | $ 5,488.97 |
| Chicago Arts Tour: | $ 3,138.00 |
| Tickets (9/1–11/15): | $ 787.85 |
| Foreign Independent Travel (FITS): | $ 977.65 |
| **TOTAL:** | **$11,069.94** |

However, Buchanan only received payments of $7,571.42 as commissions under Paragraph 4(b). In addition, Buchanan was not paid pre-approved expenses in the amount of $2,998.59. Pursuant to Paragraph 4(c), Paul Baueries prepared a check for $2,998.59 which was never cleared by the bank nor received by Mr. Buchanan.

On January 30, 1989, Dowdy, the only remaining officer, shareholder and employee of Viking, which was no longer in operation, filed with the Internal Revenue Service a Form 1099 for Buchanan reflecting income to him of $55,376.89. The compensation attributed to Buchanan was based upon $24,875 of management fees he had received and $30,501.89 worth of checks that were written to him for reimbursement, to his credit cards, or various vendors or individuals, such as Antony Underwood, allegedly on his behalf.

On January 29, 1990, Viking filed its corporate tax return for the year 1988. The return indicated that management fees had been paid to Buchanan in the amount of $24,800. At trial, Dowdy acknowledged that Buchanan was the only marketing consultant for the Corporation. Dowdy admitted that prior to issuing the Form 1099 he made no effort whatsoever to contact Buchanan or an accountant to ascertain whether or not the items attributed to him as income were in fact income to Buchanan. Dowdy indicated that he was familiar with the W–2/1099 process, because he employs 60,000 employees in other companies that he owns.

On February 28, 1989, Simone Hoover, Buchanan's accountant, wrote to Paul Baueries indicating that the Form 1099 was incorrect. A copy of this letter was sent to Dowdy. On March 16, 1989, having not received a response, Ms. Hoover wrote to Mr. Baueries again and requested assistance with regard to the Form 1099 issue. On April 4, 1989, Dowdy wrote to Buchanan and advised him that there were $30,501.89 worth of personal items attributable to him and that there was "no backup or explanation in our records to explain these expenditures." Dowdy hired an accountant to audit the 1987–1988 records and accused Buchanan of embezzlement. Dowdy demanded the return of $30,000 to $45,000. He indicated that the 1986 and 1987 company tax returns would have to be amended, but this never occurred.

On June 1, 1989, Simone Hoover, Buchanan's CPA, traveled to Houston, Texas, for the purpose of reviewing the books and records of Viking. Ms. Hoover testified that she entered a room where there were approximately a dozen boxes containing thousands and thousands of documents. She proceeded to search through the documents to ascertain support schedules for the Form 1099 expenses attributed to Buchanan. Prior to reviewing the records, Defendants provided Ms. Hoover with the calculations they had used in issuing the Form 1099. Ms. Hoover provided Dowdy with copies of all of the support documents she derived from the records of Viking at the time she inspected the documents. Ms. Hoover concluded from her review that Defendants failed to exercise reasonable care in the preparation of the Form 1099 and that Buchanan incurred a penalty of $86 and accountant fees as a direct result thereof.

We find that the Form 1099 was incorrect in that it attributed income to Mr. Buchanan that was not properly attributable to him, and that Dowdy never corrected the Form 1099. The expense of rectifying the Form 1099 was $2,054 which was incurred through November 30, 1989, the date that Mr. Buchanan filed his tax return with the IRS.

Mr. Buchanan has been a travel agent since 1976 and he put together 40 tours from June 1983 to October 1988. Both parties agree that Buchanan was a fine salesman and that he had the ability to continue putting together tours. Ms. Hoover calculated the amount of lost profits suffered by Buchanan by determining that he had average commissions of $79.78 per day during the period of time Buchanan worked under the contract, July 8, 1988 through November 15, 1988. She multiplied $79.78 by 234 days remaining on the initial one-year term of the contract. This resulted in a balance of $18,669.32. The sum of $18,669.32 represents the amount of commissions Buchanan would have earned if he had maintained his daily average.

Throughout this litigation, Defendants have taken inconsistent positions. They denied that they breached the contract and then admitted the breach at trial. Furthermore, they made serious accusations of em-

bezzlement against Buchanan and then recanted. This mode of conduct has made it necessary for Buchanan's counsel to adequately prepare to combat all accusations, even though they were later withdrawn.

## CONCLUSIONS OF LAW

Because Defendants breached the contract, Buchanan is entitled to an amount of money sufficient to place him in as good a position as if Defendants had fully performed the contract.

■ As a rule of construction, "if the written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then ... the court will construe the contract as a matter of law." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). The life of the Non–Compete Agreement, as defined in Paragraph 2, was for a period of one year and then from month to month until terminated by written notice. It is undisputed that written notice was never given by either party, therefore the contract continued up until the time of trial. Buchanan is entitled to receive $81,-750 as compensation under Paragraph 4(a) of the Non–Compete Agreement.

■ The term "new business" as defined in the Non–Compete Agreement is ambiguous. The question of whether a term in a contract is ambiguous is a question of law for the Court to decide. *R & P Enterprises v. LaGuarta, Gavrel & Kirk, Inc.*, 596 S.W.2d 517, 518 (Tex.1980). The Court may find that an ambiguity exists even if the parties have not claimed that a term is ambiguous. *Coker*, 650 S.W.2d at 392–394. A term is ambiguous if it is reasonably susceptible to more than one meaning. *R & P Enterprises*, 596 S.W.2d at 519. Once the Court finds that a term is ambiguous, "the construction given the contract by the parties and their actions under the contract, before any controversy arose as to its meaning, with knowledge of its terms, will be adopted and enforced by the courts when reasonable." *Page v. Superior Stone Products, Inc.*, 412 S.W.2d 660, 664

(Tex.Civ.App.—Austin 1967, writ ref'd n.r.e.).

■ It is not exactly clear what is meant by the term "new business" as defined in the Non–Compete Agreement. Both parties have given different interpretations of the term. Dowdy paid Buchanan commissions on sales to clients who had done business with Viking Travel, Inc. before July 8, 1988. This course of dealing shows that Dowdy was willing to pay commissions to Buchanan on sales to previous clients. The construction that the parties have given the contract is the construction that the Court will adopt. Therefore, Buchanan is entitled to recover $3,498.52 in unpaid commissions which includes some sales to previous clients.

■ The Non–Compete Agreement does not require Buchanan to devote his full efforts and time to the work of Viking Travel, Inc. Paragraph 5 of the Non–Compete Agreement states, "the company shall not have the right to require Marketing Consultant to ... devote any fixed or minimum number of hours to selling efforts." Paragraph 11 of the contract states, "Marketing Consultant will not be employed in any capacity by any other travel agency situated within [Harris County, Texas]." We construe the contract to provide that Buchanan could have been employed outside of Harris County without breaching the Non–Compete Agreement.

■ Buchanan has no duty to mitigate damages. Dowdy cites *Measday v. Kwik-Kopy Corp.*, 713 F.2d 118 (5th Cir.1983) as support for his claim that Plaintiff must apply the money that he earned from his Florida travel agency to reduce his damages. In *Measday*, the Plaintiff was required "to devote his full time, energy and effort" to the entity with which he had contracted to provide services. In the case at bar, Buchanan was under no such duty. The other precedent Dowdy urges us to follow also deals with a normal employment situation and is factually different from the case at bar. *Gulf Consolidated International, Inc. v. Murphy*, 658 S.W.2d 565 (Tex.1983).

*Jaffray v. King,* 34 Md. 217 (1871) is directly on point and has been relied upon by Texas Courts for related issues. *Kramer v. Wolf Cigar Stores Co.,* 99 Tex. 597, 91 S.W. 775 (1906); *Elliot–Greer Office Supply Co. v. Martin,* 54 S.W.2d 1068 (Tex.Civ.App.—Amarillo 1932), *rev'd on other grounds,* 126 Tex. 112, 86 S.W.2d 635 (1936); *Texas Life Ins. Co. v. Roberts,* 55 Tex.Civ.App. 217, 119 S.W. 926 (1909, no writ). In *Jaffray,* the Maryland Court held that an employer may not require mitigation of the damages of an employee by amounts earned after a contract is breached unless the employer is able to demonstrate that the employee could not have earned the money without violating his employment contract. Buchanan's Non–Compete Agreement expressly permitted him to work as a travel agent anywhere outside of Harris County. Therefore, he did not violate the contract by working for the Florida travel agency. The money he earned at the Florida travel agency will not be applied to mitigate Buchanan's damages for Defendant's breach of the Non–Compete Agreement.

█ Recovery for lost profits will be denied when such profits are too uncertain or speculative. However, a party who breaches a contract "cannot escape liability because it is impossible to state or prove a perfect measure of damages." *Southwest Battery Corp. v. Owen,* 131 Tex. 423, 115 S.W.2d 1097, 1099 (1938). Lost profits for a new enterprise may be established based upon the success of a previous business. *Pena v. Ludwig,* 766 S.W.2d 298 (Tex. App.—Waco 1989, no writ).

█ The facts that support a recovery for lost commissions in this case are simple. Buchanan organized 40 group tours from June 1983 to October 1988. He has an established record of performance. Commissions he earned up until breach of the contract can be easily annualized to provide a lost commissions figure for the initial term of the contract. Buchanan is entitled to recover $18,669.32 as lost commissions. Any commissions beyond the initial term of the contract are too speculative based upon the evidence presented at trial and are therefore not recoverable. We further conclude that Buchanan may not recover accountant's fees in regard to the lost commission issue.

Buchanan is entitled to recover $2,998.59 as pre-approved expenses pursuant to Paragraph 4(c) of the Non–Compete Agreement. This amount was pre-approved and a check was written, however, never received by Buchanan.

█ The Fifth Circuit has held that, "persons who undertake the duty of filing information returns concerning their employees and ex-employees have a duty to act with reasonable promptness to correct erroneous information they have sent to the IRS when such errors come to their attention." Accountant's fees and penalties are recoverable as damages when employers do not fulfill this duty. *Clemens v. USV Pharmaceutical,* 838 F.2d 1389 (5th Cir.1988). Dowdy was asked to correct the erroneous Form 1099 but failed to do so. Dowdy was negligent in that he failed to correct the erroneous Form 1099. As a direct result, Buchanan was required to employ the services of an accountant in order to file a proper tax return. He incurred accountant's fees of $2,054 and a penalty of $86 which he may recover as damages. Fees incurred after the return was filed will not be awarded.

█ A prevailing party is the party to a law suit who successfully prosecutes the action or successfully defends against it, prevailing on the main issue, even though not necessarily to the extent of his original contention. BLACKS LAW DICTIONARY 1069 (5th ed.1979). See also *Criton Corp. v. Highlands Ins. Co.,* 809 S.W.2d 355 (Tex. App.—Houston [14th Dist] 1991, no writ). Buchanan is the prevailing party in the dispute concerning the breach of Non–Compete Agreement and is therefore entitled to recover attorney's fees.

Dowdy's theory that he is the prevailing party is simply without merit. He claims that he is the prevailing party because he

made an offer of settlement during the course of the litigation. However, Dowdy's offer of settlement included a reduction for the earnings from the Florida corporation which Buchanan vigorously argued was inapplicable to the facts of the case. Mitigation has been found to not be warranted by the Court. The settlement offer also contained a mutual release which was adverse to Plaintiff's interests. Dowdy's settlement offer does not serve to make him the prevailing party.

In determining the reasonableness of an award of attorney's fees, the Court must look to the factors outlined in *Golden v. Murphy*, 611 S.W.2d 914 (Tex.Civ.App.—Houston [14th Dist.] 1981, no writ). The first factor is the nature of the case including its difficulties, complexities and importance, and the nature of the services required to be rendered by counsel. In the final analysis, this case may appear to be simple. But during the course of the litigation, Dowdy made many accusations against Buchanan and later withdrew those allegations. It was important for Buchanan's counsel to adequately prepare to combat the accusations. In addition, the pretrial order reveals several contested areas of the case which were readily admitted at trial, for instance, whether the contract was breached, the amount of damages to which Buchanan was entitled, and the amount of offsets to which Dowdy was entitled. Defendants set up a string of hurdles, then as Buchanan overcame each one, Defendants acquiesced and removed it. Dowdy cannot claim that Buchanan has incurred excessive attorney's fees where Dowdy has altered his litigation position to such an extent.

The second factor that the Texas Courts evaluate in determining the reasonableness of attorney's fees is the amount of money involved in the case, along with the amount of time devoted by the attorney, what the client has at stake, and the benefit he will derive from the services. Buchanan, a travel agent, had a great deal at stake. His suit concerned a substantial portion of his income during the time of the contract.

Furthermore, Buchanan's attorney zealously advocated the case and obtained a substantial benefit for Buchanan.

Thirdly, we must evaluate the necessary time spent by the attorney, the responsibility imposed upon counsel, and the skill and experience reasonably needed to perform the services. Buchanan's attorneys both possessed the requisite skill evidenced by their L.L.M. degrees and professional performance at trial. As for the time spent on this case, Buchanan's attorneys submitted detailed time reports outlining the various aspects of the litigation they were involved in, as well as the substance of what that work included. This Court finds that the time spent by Buchanan's attorneys was reasonable for this case. The Court does not accept Dowdy's counsel's conclusion that his fees were reasonable at $22,000 and that the Plaintiff's two trial attorneys were only entitled to $15,000 in fees. The Court holds that Buchanan is entitled to attorney's fees in the amount of $39,603.20.

Buchanan is entitled to prejudgment interest at a rate of 6% on the damages that are recoverable under Section 4(a) of the Non–Compete Agreement because these damages are calculable from the face of the contract. Interest on all other damages is payable at 10%. *See Perry Roofing Co. v. Olcott*, 744 S.W.2d 929 (Tex.1988); *Winograd v. Willis*, 789 S.W.2d 307, (Tex. App.—Houston [14th Dist.] 1990, writ denied). The amount of interest for the Paragraph 4(a) damages is $5,130.78. For a detailed analysis of the Court's determination of how interest was calculated on the Paragraph 4(a) damages, see Schedule A to this Opinion. The amount of interest for Paragraph 4(b) damages for the unpaid commissions is $762.01, for the lost commissions is $2,864.33. Interest for the Paragraph 4(c) damages is $693.37 and for the Form 1099 damages is $261.49.

Any of the foregoing conclusions of law constituting findings of fact are hereby adopted as such and any of the foregoing findings of fact constituting conclusions of law are also hereby adopted as such.

## SCHEDULE A

| Payment Due Date | Amount | First Day of Interest | Days to 2/19/91 | Interest at 6% |
|---|---|---|---|---|
| 11/15/88 | $  750 | 12/15/88 | 796 | $   98.17 |
| 12/1/88 | 1500 | 1/1/89 | 779 | 192.08 |
| 12/15/88 | 1500 | 1/15/89 | 765 | 188.63 |
| 1/1/89 | 1500 | 2/1/89 | 748 | 184.44 |
| 1/15/89 | 1500 | 2/15/89 | 734 | 180.99 |
| 2/1/89 | 1500 | 3/1/89 | 720 | 177.53 |
| 2/15/89 | 1500 | 3/15/89 | 706 | 174.08 |
| 3/1/89 | 1500 | 4/1/89 | 689 | 169.89 |
| 3/15/89 | 1500 | 4/15/89 | 675 | 166.44 |
| 4/1/89 | 1500 | 5/1/89 | 659 | 162.49 |
| 4/15/89 | 1500 | 5/15/89 | 645 | 159.04 |
| 5/1/89 | 1500 | 6/1/89 | 628 | 154.85 |
| 5/15/89 | 1500 | 6/15/89 | 614 | 151.40 |
| 6/1/89 | 1500 | 7/1/89 | 598 | 147.45 |
| 6/15/89 | 1500 | 7/15/89 | 584 | 144.00 |
| 7/1/89 | 1500 | 8/1/89 | 567 | 139.81 |
| 7/15/89 | 1500 | 8/15/89 | 553 | 136.36 |
| 8/1/89 | 1500 | 9/1/89 | 536 | 132.16 |
| 8/15/89 | 1500 | 9/15/89 | 522 | 128.71 |
| 9/1/89 · | 1500 | 10/1/89 | 506 | 124.77 |
| 9/15/89 | 1500 | 10/15/89 | 492 | 121.32 |
| 10/1/89 | 1500 | 11/1/89 | 475 | . 117.12 |
| 10/15/89 | 1500 | 11/15/89 | 461 | 113.67 |
| 11/1/89 | 1500 | 12/1/89 | 445 | 109.73 |
| 11/15/89 | 1500 | 12/15/89 | 431 | 106.27 |
| 12/1/89 | 1500 | 1/1/90 | 414 | 102.08 |
| 12/15/89 | 1500 | 1/15/90 | 400 | 98.63 |
| 1/1/90 | 1500 | 2/1/90 | 383 | 94.44 |
| 1/15/90 | 1500 | 2/15/90 | 369 | 90.99 |
| 2/1/90 | 1500 | 3/1/90 | 355 | 87.54 |
| 2/15/90 | 1500 | 3/15/90 | 341 | 84.08 |
| 3/1/90 | 1500 | 4/1/90 | 324 | 79.89 |
| 3/15/90 | 1500 | 4/15/90 | 310 | 76.44 |
| 4/1/90 | 1500 | 5/1/90 | 294 | 72.49 |
| 4/15/90 | 1500 | 5/15/90 | 280 | 69.04 |
| 5/1/90 | 1500 | 6/1/90 | 263 | 64.85 |
| 5/15/90 | 1500 | 6/15/90 | 249 | 61.40 |
| 6/1/90 | 1500 | 7/1/90 | 233 | 57.45 |
| 6/15/90 | 1500 | 7/15/90 | 219 | 54.00 |
| 7/1/90 | 1500 | 8/1/90 | 202 | 49.81 |
| · 7/15/90 | 1500 | 8/15/90 | 188 | 46.36 |
| 8/1/90 | 1500 | 9/1/90 | 171 | 42.16 |
| 8/15/90 | 1500 | 9/15/90 | 157 | 38.71 |
| 9/1/90 | 1500 | 10/1/90 | 141 | 34.77 |
| 9/15/90 | 1500 | 10/15/90 | 127 | 31.32 |
| 10/1/90 | 1500 | 11/1/90 | 110 | 27.12 |
| 10/15/90 | 1500 | 11/15/90 | 96 | 23.67 |
| 11/1/90 | 1500 | 12/1/90 | 80 | 19.73 |
| 11/15/90 | 1500 | 12/15/90 | 66 | 16.27 |
| 12/1/90 | 1500 | 1/1/91 | 49 | 12.08 |
| 12/15/90 | 1500 | 1/15/91 | 35 | 8.63 |
| 1/1/91 | 1500 | 2/1/91 | 18 | 4.44 |
| 1/15/91 | 1500 | 2/15/91 | 4 | .99 |
| 2/1/91 | 1500 | – | – | – |
| 2/15/91 | 1500 | – | – | – |
|  | $81,750 |  |  | $5,130.78 |

JUDGMENT

By consent of the parties this action came on for trial to the Court, Honorable Frances H. Stacy, United States Magistrate Judge, presiding. The issues have been tried and Findings of Fact and Conclusions of Law have been made. Judgment is hereby RENDERED for Plaintiff, Buchanan.

IT IS ORDERED AND ADJUDGED that the Defendants, Jerry Dowdy and Viking Travel, Inc., are jointly and severally liable and that they must pay to the Plaintiff, Jerry Buchanan, the sum of $109,056.43, the amount due and owing by Defendants to Buchanan on the Non–Compete Agreement, and damages for preparing and failing to correct the erroneous IRS Form 1099, the subject of this suit.

IT IS FURTHER ORDERED AND ADJUDGED that Defendants, Jerry Dowdy and Viking Travel, Inc., pay to Plaintiff, Jerry Buchanan, attorney's fees of $39,603.20, prejudgment interest of $9,711.98 and costs of $2,343.75.

The parties shall remove their exhibits from the Clerk's Office within 30 days of the filing of this Judgment in accordance with Local Rule 13.